RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
(973) 538-0800

Attorneys for Plaintiffs
Johnson & Johnson and Cordis Corporation

| | |
|---|---|
| JOHNSON & JOHNSON and CORDIS CORPORATION,<br><br>                                        Plaintiffs,<br><br>vs.<br><br>EV3, INC., RHONDA BARR, ANDREW FITZPATRICK AND BRENDAN McKEEVER,<br><br>                                        Defendants. | UNITED STATES DISTRICT COURT<br>DISTRICT OF NEW JERSEY<br><br>CIVIL ACTION NO. 09-6306(GEB)<br><br>CIVIL ACTION<br><br>**REPLY CERTIFICATION<br>OF ERIC WOLF** |

I, Eric Wolf, of full age, certify as follows:

1.      I am a Division Manager of Cordis Corporation ("Cordis"). This Reply Certification is submitted in further support of plaintiffs' temporary restraining order and expedited discovery application.

2.      I have reviewed Rhonda Barr's December 16, 2009 Certification, and provide the following information to address certain incorrect, incomplete and misleading statements therein. It is necessary to probe beyond the superficial denials contained in Barr's Certification and to address the specific facts of Barr's employment with Cordis. In doing so, it becomes clear that the selling of endovascular and cardiovascular products is a relationship-driven business, and that Barr possesses crucial customer relationships that she developed and maintained for Cordis' benefit and at Cordis' great expense. She is now able to exploit those relationships for ev3's

benefit. It also becomes clear that, far from the sealed-off, "separate" divisions of Cordis Cardiology and Endovascular that Barr strains to depict, there was a great deal of collaborative and collective work between Cardiology and Endovascular, and that Barr received significant exposure to sensitive information of Cordis Endovascular in the process.

3. Barr states (¶17) that she "never handled the marketing or sale of the products offered through Cordis Endo used to treat endovascular disease" and "never called on any customers in connection with Cordis Endo's products or services." Those statements are misleading. Through a variety of means, Barr was exposed to and acquired sensitive information about Cordis Endovascular's business and products during her employment with Cordis from April 2005 through February 2009.

4. For example, Barr participated in Cordis' co-promotion rebate programs. These programs involved both Cordis Endovascular and Cardiology Sales Representatives. Cordis set collective sales targets for its Endovascular and Cardiology Sales Representatives with respect to certain large accounts. If the given account's collective purchases for both Endovascular and Cardiology products met a certain level, the account would receive a rebate from Cordis.

5. Barr attended and participated in co-promotion rebate meetings with Cordis managers and Endovascular Sales Representatives at which Cordis' collective, i.e., Endovascular and Cardiology, sales efforts were discussed, and information was shared about sales, attempted sales, specific purchasers, etc. on both the Endovascular and Cardiology sides of the business. Barr also attended and participated in meetings with representatives from Cordis accounts that participated in the co-promotion rebate programs. At those meetings, the Cordis personnel, including Barr, discussed with the account's representatives the targets that would need to be met

in order to receive rebates, as well as both Endovascular and Cardiology sales information for the account.

6. In addition to these meetings, as part of the co-promotion rebate programs, both Endovascular and Cardiology Sales Representatives received e-mail updates from Cordis managers that tracked the accounts in the Sales Representatives' respective territories as respects the accounts' progress toward meeting the targeted sales goals. Such updates included both Endovascular and Cardiology target and sales information.

7. Another source of Barr's exposure to and acquisition of sensitive information of Cordis' Endovascular products occurred at Cordis' national sales meetings, which typically occurred once per year. At such meetings, proprietary information such as products in the pipeline, the annual performance of the Cardio and Endo product lines and the like was discussed..

8. Barr attended Cordis divisional meetings as well. Typically, such meetings occurred at least twice during the period of about August 2007 through October 2008, and Managers and Sales Representatives presented to the participants on Endovascular and Cardiology products, sales, division rankings and other information. Both Cordis Endovascular and Cardiology Sales Representatives attended and participated. .

9. Barr's effort (¶22-23) to paint Cordis Endovascular and Cardiology as separate divisions, sealed off from each other and without interaction, sharing of information and collaborative sales efforts is belied by actual facts, such as:

- In 2006, Barr and the Cordis Endovascular Sales Representative for the Shreveport territory finished as one of the top teams in a national Cordis sales competition involving the Cypher® Sirolimus-eluting Coronary Stent ("Cypher® Stent"), known as the Cypher® Stent co-promotion. Even though the Cypher® Stent is a cardiology product, the

Endovascular Sales Representative helped Barr sell Cypher® Stents by advising her of Stent-related inquiries that he received from physicians and others, and provided case support and leveraged his customer relationships to promote Cypher® Stent sales.

- Cordis Sales Representatives use an internal website, www.mycordis.com, to access sales information, including training materials, sales rankings and rosters of Sales Representatives, sales reports, educational materials, promotional materials, marketing materials and clinical data. Cordis does not maintain separate mycordisendovascular.com and mycordiscardiology.com websites.

- Cordis launched joint Cardiology / Endovascular marketing programs such as the "Cordis ONE" program and the "Cordis Unity Program," or "CUP," program, which involved customers achieving or maintaining certain purchasing goals in both Endo and Cardio. The customers needed to achieve or maintain such goals in both Endo and Cardio to receive certain rebates. The Cordis ONE and/or CUP programs were rolled out to some of Barr's key customers at Cordis, including Glenwood Regional Medical Center and Willis Knighton Medical Center. Barr worked on these programs with the Cordis Endovascular Sales Representative in the Shreveport territory.

- Barr incorrectly implies that because for a period of time she and the Shreveport Endovascular Sales Representative reported to different managers, there was a "separation" between Cordis Cardiology and Endovascular. Barr does not explain why she and the Endovascular Sales Representative did so. Barr requested that she continue to report to Michael McNulty, the manager who had trained her, rather than another manager, and McNulty also wanted to keep his top-performing Sales Representative, Barr, within his group. Consequently, the reporting structure of which Barr makes so much resulted from her and McNulty's personal requests and preferences, which Cordis management accommodated – not from any supposed "separation" between Cordis Endovascular and Cardiology. Barr also fails to explain that both Endovascular and Cardiology Sales Representatives reported to both McNulty and the manager to whom the Shreveport Endovascular Sales Representative reported.

- Hospitals often assign weeks or days to product manufacturers, such as Cordis and ev3, when only one manufacturer's sales representatives are permitted to visit the hospital and call on physicians, purchasing agents and other administrators and staff (except if a physician asks to see a representative from another manufacturer on that day or week). Such a week or day is known as a "Cordis week" or a "Cordis day." The "Cordis weeks" and "Cordis days" hosted by various hospitals in the Shreveport territory were not divided or separated into "Cordis Endovascular" and "Cordis Cardiology" weeks and days. Accordingly, both Barr and the Cordis Endovascular Representative were present at the hospital, seeing which customers the other was spending significant time with, speaking with each other about their sales efforts and activities and sharing information about various contacts within the hospital. If for some reason Barr or the Endovascular Sales Representative were unable to attend a given Cordis day at a hospital, the presence of the other would ensure that there was a "Cordis" presence at the hospital.

10. Barr states (¶24) that she "never promoted endovascular products nor did I ever sell to or discuss with customers on behalf of' Cordis Endo." She disregards, however, that she would not have been the #1 Cordis Cardiology Sales Representative in the United States – or a responsible, productive Sales Representative at all, for that matter – if she ignored inquiries about Cordis Endovascular from physicians (such as interventional cardiologists who also performed endovascular procedures) and other customers (such as purchasing agents, hospital administrators and catheterization laboratory nurses and staffs, whose responsibilities include selecting, using, negotiating and/or purchasing purchase both Cardiology and Endovascular products for interventional cardiologists). Cordis Endovascular and Cardiology Sales Representatives strive, or should strive, to be the "go-to" person for their customers and to be able to answer at least basic questions about products in the other area, be it endovascular or cardiovascular.

11. It is important to observe that interventional cardiologists who do not presently perform endovascular work can start performing endovascular procedures if they so desire (provided the hospital permits him or her to do so). Accordingly, an endovascular sales representative can approach such an interventional cardiologist, discuss the potential for performing endovascular procedures and offer training to do so through individual training by the sales representative and/or through physician-taught courses that Cordis periodically provides. It is the relationship-driven nature of the business that underlies such discussions by the sales representatives with the physician. Accordingly, even interventional cardiologists who do not perform endovascular procedures are potential candidates for endovascular business.

12. It is simply good business practice to attempt to keep the inquiring customer in the Cordis family by answering any questions that can be answered, gathering as much

information about the inquiry as possible, referring the customer to the Cordis Endovascular Sales Representative, contacting that Sales Representative to advise about the inquiry, business opportunity, potential sale, etc. This referring of customers between Cordis Cardiology and Endovascular Sales Representatives is commonplace at Cordis, and simply represents good business practice. For Barr to imply that such discussions with customers, intelligence gathering about customers and intra-Cordis referrals did not occur defies common sense.

13. Barr states (¶25) that she "was never trained on endovascular products or any products sold by Cordis Endo." She disregards, however, that at Cordis divisional meetings, Sales Representatives typically are briefed through overview and familiarization presentations on both Cardio and Endo products, so that, for example, Cardio Sales Representatives are able to answer at least basic questions about Endo products.

14. Barr states (¶27) that she "never had any knowledge of Cordis Endo's sales or marketing strategies." She does not explain, however, that through discussions with the Shreveport Cordis Endovascular Sales Representative, she learned of which physicians, purchasing agents, hospital administrators, etc. were the biggest accounts in the territory in terms of endovascular purchasing volume, procedures performed and the like. She also learned at which accounts the Endovascular Sales Representative spent most of his time. Conversely, she also learned which accounts were vulnerable for Cordis. Thus, she learned the strengths and the weaknesses of Cordis' Endovascular business and customer relationships in the Shreveport territory.

15. Barr's knowledge of Cordis' customer relationships for selling endovascular products, as well as her own customer relationships that she developed while at Cordis, involves extremely valuable, proprietary interests that plaintiffs seek to protect through this application

and action. Plaintiffs also seek to protect such interests through the Employee Secrecy, Non-Competition and Non-Solicitation Agreements ("Agreements") (specifically, ¶7) that Sales Representatives such as Barr sign with plaintiffs.

16. Sales Representatives such as Barr develop very close relationships and bonds with their customers. Sales Representatives often put on scrubs and join the customer physician in the procedure room during the procedure. Sales Representatives stand near the physician, within audible range, assist the physician by pulling appropriate product (e.g., a certain sized stent) from the shelf for the physician's use in the procedure, and by answering questions, if asked by the physician, about the case, such as the size of certain medical devices that might be used.

17. This process is known as "being in a case." A Sales Representative can ask the physician to be in a case, or vice versa, or the Sales Representative can sign up on a schedule provided by the hospital. Another way to "be in a case" is by arranging to do so during a "Cordis week" or "Cordis day" at a given hospital.

18. Sales Representatives often move from room to room with the physician as the physician performs different types of procedures, such as with an interventional cardiologist who performs an endovascular procedure, followed by a cardiovascular procedure, followed by an endovascular procedure, and so on. In that way, Cardiology Sales Representatives gain exposure to endovascular procedures, and vice versa, and are able to ask the physician questions about the procedure that he or she is performing, be it endovascular or cardiovascular.

19. The selling of endovascular and cardiovascular products is a relationship-driven business. Developing and maintaining one's relationships with physicians, purchasing agents,

hospital administrators, catheterization laboratory nurses and staff, etc. is paramount to the Sales Representative's success.

20.   Barr states (¶28) that she "never attended any 'in-services' for any Cordis Endo products" and "never had any knowledge of Parik's sales and marketing strategies." She ignores, however, that she and Parikh held Cardiology and Endovascular combination lunches for accounts in the Shreveport territory at which they answered questions about Cordis' Cardiology and Endovascular products. Such events often involved a video presentation, a physical model of a product, handouts of data and the like, addressing Cordis' Cardiology and Endovascular products – another source of Barr's exposure to Cordis Endovascular products and information. Barr and the Endovascular Sales Representative also co-hosted at least one Holiday Party for their customers, both cardiology and endovascular.

21.   Barr states (¶29) that she "never had any knowledge about Cordis Endo's cost per product or pricing." She again disregards the co-promotion rebate programs in which she participated and through which she gained knowledge of, among other things, Cordis accounts' volume targets for endovascular products and sales information.

22.   Barr states (¶30) that she "was never asked to, nor did I volunteer, to answer questions regarding Cordis Endo's product line." She ignores, however, the questions and requests that Sales Representatives encounter from customers concerning products outside of their immediate area, such as whether Cordis offers a certain type of product and whether the Sales Representative can follow up with his or her colleague about the delivery of certain needed products. It is through these types of interactions with a customer that Sales Representatives learn valuable information about the customer's needs and potential needs, the products that it stocks and the like. It is a Cordis directive that such "intelligence" is to be shared with the

8

appropriate Sales Representative in the territory, such that Barr shared Endovascular customer leads and information with the Endovascular Sales Representative, who likewise shared Cardiology customer leads and information with Barr.

23. Barr states (¶31) that she "never attended a sales presentation by a Cordis Endo sales representative to a physician or other customer." Barr overlooks that she met with interventional cardiologists and others at an event that had entailed a dinner and an endovascular presentation by Dr. Ramee in Shreveport. Many interventional cardiologists who perform both endovascular and cardiovascular procedures attended the event, which provided an opportunity for Barr to meet with and further develop her relationships with such interventional cardiologists. She also overlooks the Cordis co-promotion programs in which she and the Endovascular Sales Representative participated together, such as for the Cypher® Stent.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　Eric Wolf

Dated: December 21, 2009

4005351.1

9